UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KMW GROUP, INC., d/b/a SKYTRON, and
SKYTRON, LLC,

       Plaintiffs,                    Case No. 1:11-cv-1212

v.                                  HON. JANET T. NEFF

AWAREPOINT CORPORATION,

       Defendant.
_____/

AWAREPOINT CORPORATION,

       Plaintiff,                     Member Case: 1:12-cv-94

v.

KMW GROUP, INC., d/b/a SKYTRON,
UNKNOWN PARTIES (named as Does 1-10),
and SKYTRON, LLC,

       Defendants.
_____/

## OPINION

Pending before the Court is Defendant Awarepoint Corporation's Motion for Partial Summary Judgment (Dkt 131).[1] Plaintiffs KMW Group, Inc. (d/b/a "Skytron") and Skytron, LLC, (collectively, "Skytron") have filed a Response (Dkt 132), and Defendant has filed a Reply (Dkt 134). For the reasons that follow, the Court denies the motion.

---

[1] Unless otherwise noted, the party references and docket citations in this Opinion refer to the lead case, no. 1:11-cv-1212, the docket of which provides cross-references for documents also filed in the member case, no. 1:12-cv-94.

## I. Facts

Awarepoint is a Delaware corporation headquartered in San Diego, California; Awarepoint's products are components of real-time location (RTLS) systems (hardware and software) that allow hospitals to quickly locate important equipment, hospital personnel, and patients (Joint Statement of Material Facts (JSMF), Dkt 133, ¶¶ 1-3). The system uses sensors deployed in the end-user's facility, which track the electronic signal emitted by "tags" attached to the assets or people being tracked (*id.* ¶ 3).

Skytron is a Michigan corporation with headquarters in Grand Rapids, Michigan. Skytron manufactures and sells medical equipment to health care facilities (JSMF ¶ 4).

In October 2007, the parties entered into a supply agreement ("2007 Supply Agreement") under which Skytron agreed to purchase at least $2,392,500 of Awarepoint products, and Awarepoint agreed to refrain from selling its products to five of Skytron's direct competitors, referred to as "limited exclusivity" in connection with the sale of Awarepoint's products (JSMF ¶¶ 5-6, 8). The purpose of the parties' arrangement was to provide Awarepoint with guaranteed minimum cash flows to fund its operations (*id.* ¶ 7). The Agreement also contained a "Managed Services" component under which Awarepoint was obligated to provide ongoing services to the customers that bought Awarepoint products from Skytron for a per-tag fee to be paid monthly by Skytron (*id.* ¶¶ 31-32). The 2007 Supply Agreement was later modified to obligate Skytron to purchase a minimum of $7,000,000 of Awarepoint product in 2009 pursuant to the "October 30 Notice," which reinforced a joint marketing commitment and expanded the "limited exclusivity" provisions (*id.* ¶¶ 11-19).

On December 31, 2009, the parties executed a new supply agreement (the "2009 Supply Agreement") subject to final review and approval, as reflected in the First Amendment to the 2009 Supply Agreement (JSMF ¶ 20).  Under the 2009 Supply Agreement, Skytron committed to guaranteed minimum purchases of $16,000,000 of Awarepoint products in 2010 (*id.* ¶¶ 22-23). Skytron also committed to a sales quota of $21,000,000 in Awarepoint products in 2010 (*id.* ¶¶ 25-26).  However, in late 2010, the parties executed a "Second Amendment" to the 2009 Supply Agreement, changing the minimum purchases to $13,000,016.17 and the sales quota to $18,000,000 (*id.* ¶¶ 27-28).  The 2009 Agreement continued the fee-based Managed Services, although as a percentage annual maintenance fee of 20% on all purchases (*id.* ¶ 35).

Skytron did not meet the contractual sales quota for 2010 (JSMF ¶ 29).  In the latter half of 2010, disputes arose between the parties regarding amounts that were owed under the Agreements, including service fees owed (*id.* ¶ 38).  The parties' attempts to negotiate terms for a "go-forward" financial arrangement for 2011 were unsuccessful (*id.* ¶ 30).  The parties' business relationship ended, with Skytron allegedly left with an inventory of Awarepoint products that Skytron cannot sell (Compl., Dkt 1, ¶ 19).  The total amount of unpaid support service provided by Awarepoint since October 2011 is $1,633,560 (JSMF ¶ 120).  The current accounts payable due to Skytron is $490,018 (*id.* ¶ 121).

On November 14, 2011, Skytron filed suit against Awarepoint Corporation seeking damages for breach of the Supply Agreements and for tortious interference of business expectancy (lead case 1:11-cv-1212).  On January 30, 2012, a second case, filed by Awarepoint against Skytron and other unnamed parties in California, was transferred to this district (member case 1:12-cv-94), and seeks declaratory relief and damages from Skytron and others for breach of the Supply Agreements.

3

## II.  Legal Standard

A party may move for partial summary judgment, identifying the part of each claim or defense on which summary judgment is sought. FED. R. CIV. P. 56(a). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*  The court must consider the evidence and all reasonable inferences in favor of the nonmoving party. *Burgess v. Fischer,* 735 F.3d 462, 471 (6th Cir. 2013); *U. S. S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (citation omitted).

The moving party has the initial burden of showing the absence of a genuine issue of material fact. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 200 (6th Cir. 2010).  The burden then "shifts to the nonmoving party, who must present some 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "There is no genuine issue for trial where the record 'taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Burgess,* 735 F.3d at 471 (quoting *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The ultimate inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sierra Brokerage Servs.,* 712 F.3d at 327 (quoting *Anderson,* 477 U.S. at 251-52).

## III.  Discussion

Awarepoint seeks summary judgment on five matters, as follows:

1. The 2009 Supply Agreement terminated on January 1, 2011, as a result of Skytron's failure to meet its sales quota for the calendar year 2010;

2. The Supply Agreements preclude recovery of damages that Skytron seeks in this

        action and Skytron's remedies under the Supply Agreements are limited to repair and replacement of defective products;

3.     Skytron's entire claim for tortious interference fails as a matter of law;

4.     Skytron's claim for tortious interference based on Awarepoint's actions prior to October 30, 2008, and after January 1, 2011, fails as a matter of law; and

5.     Skytron owes Awarepoint at least $1,789,422.00 under the Supply Agreements and related service agreements, "SLAs."[2]

Having reviewed the parties' contentions and the present record, the Court concludes that genuine issues of material fact exist on these matters, which preclude judgment as matter of law.

### A. Supply Agreement Termination

Awarepoint states that the issue regarding when the 2009 Supply Agreement terminated is resolved through "interpretation of the contract" (Mot. Brf., Dkt 131-1 at p. ID# 712). Awarepoint contends that the 2009 Supply Agreement terminated on January 1, 2011 pursuant to the Agreement's unambiguous terms because Skytron failed to achieve the agreed sales quota of $18,000,000 during 2010. The Agreement provided that the failure to meet the sales quota would result in termination of the Agreement on January 1, 2011:

> The term of this Agreement will commence on the Effective Date and will continue thereafter in full force and effect until January 1, 2012 (the "Initial Term"), unless (i) Skytron fails to meet its sales quota of $21,000,000 for the calendar year 2010, or (ii) earlier terminated as provided in Section 10 *(Termination)*. …

(2009 Supply Agreement ¶ 9, Dep. Ex. 15 at p. ID# 843).

Awarepoint argues that upon Skytron's failure to meet the 2010 sales quota, Awarepoint was relieved of all obligations under the 2009 Supply Agreement, except those that expressly survived

---

[2]Service Level Agreements, by which maintenance costs were passed along to the end-users of Awarepoint's products (JSMF ¶ 36).

termination. Consequently, Awarepoint was free to compete directly with Skytron for sales of Awarepoint's products and was under no obligation to support Skytron's sales through joint marketing efforts. And since many of Skytron's claims in this case relate to Awarepoint's actions in competing with Skytron after January 1, 2011, those claims provide no basis for recovery and Awarepoint is entitled to summary judgment of those claims.

Skytron does not dispute the termination provision of the Agreement cited by Awarepoint, but asserts that Awarepoint disregards that it was, at least in substantial part, Awarepoint's own conduct that prevented Skytron from achieving the sales quota. Skytron argues that under applicable New York and Delaware contract principles,[3] a party cannot benefit from its own contractual breach—a party who causes or sanctions the breach of an agreement is precluded from recovering damages for its nonperformance or from interposing it as a defense to an action upon the contract. *See, e.g.*, *Haft v. Dart Group Corp.*, 877 F. Supp. 896, 904 (D. Del. 1995); *Patterson v. Meyerhofer*, 204 N.Y. 96, 100-01, 97 N.E. 473 (N.Y. 1912). Further, it is fundamental that a duty of good faith and fair dealing is inherent in every contract. *Johnson v. Gov't Emps. Ins. Co.*, No. 06–408–RGA, 2014 WL 2708300, at *3 (D. Del. June 16, 2014); *see also Lowell v. Twin Disc, Inc.*, 527 F.2d 767, 770 (2d Cir. 1975). "'Persons invoking the aid of contracts are under implied obligation to exercise good faith not to frustrate the contracts into which they have entered.'" *Lowell*, 527 F.2d at 770 (citation omitted). Likewise, a "'duty of cooperation'" is imposed on both parties, meaning that "'whenever the cooperation of the promisee is necessary for the performance of the promise, there is a condition implied that the cooperation will be given.'" *Id.* (citation omitted).

---

[3]The Court previously ruled that New York law applies for claims arising under the 2007 Supply Agreement and Delaware law applies for claims arising under the 2009 Supply Agreement (Op., Dkt 126).

6

Skytron asserts that the record shows, or at a minimum raises issues of fact whether, Awarepoint committed numerous material breaches of its obligations under the Agreement that contributed significantly to Skytron's failure to meet the sales quota in 2010 and resulted in the loss of Skytron's "limited exclusivity" for 2011. Skytron argues that it thus would be improper to grant judgment as a matter of law on whether the Agreement terminated early, on January 1, 2011, or on its termination date of January 1, 2012. Skytron asserts that there were two major areas of breach, both of which significantly contributed to the shortfall in Skytron's sales: "Awarepoint's repeated failure to timely deliver hardware with the features and capabilities it had promised, and a continual lack of effective support from the Awarepoint sales personnel who were obligated to help drive sales of the Skytron inventory" (Resp. Brf., Dkt 132, p. ID# 964).[4]

Skytron sets forth ample record support for its factual contentions, including that Awarepoint consistently failed to deliver asset tracking hardware capable of the level of accuracy Awarepoint promised; the hardware Awarepoint delivered had significant defects or did not meet Awarepoint's promised capabilities, such as premature battery failure and tags that were not sterilizable or "autoclavable" or exploded, corrupting medical instruments, all of which interfered with asset tracking and resulted in significant issues for Skytron customers (*id.* at p. ID# 964-69). Additionally, Skytron cites ample record support for its assertion that Awarepoint sales personnel failed to support Skytron's sales efforts, or worse, actively undermined Skytron's sales efforts, in breach of Awarepoint's contractual obligation to assist Skytron in driving sales to move the inventory it was buying from Awarepoint (*id.* at p. ID# 969-72).

---

[4]Under the 2009 Agreement, Awarepoint had a duty to "sell Skytron Products that meet, in all material respects, the technical and quality specifications in Annex A [which incorporated Awarepoint's current product catalog]" (2009 Supply Ag. ¶ 3(a)(i)).

Both Skytron and Awarepoint witnesses, including former high-ranking Awarepoint executives,[5] provided testimony that supports Skytron's assertions of Awarepoint product failures or shortcomings that interfered with Skytron achieving the agreed-upon sales quota (*see* Resp. Brf. at p. ID# 966-69). Likewise, there was testimony from both parties' witnesses that Awarepoint sales personnel failed to support Skytron's sales efforts (*see id.* at p. ID# 969-72). Skytron also cites evidence of other Awarepoint breaches that contributed to its inability to meet the 2010 sales quota and maintain "limited exclusivity,""including failure to co-market with Skytron at trade shows, failing to provide marketing materials, failing to provide return on investment information as required by the Agreement, and generally failing to promote and support Skytron as it had promised to do" (*id.* at p. ID# 971, citing Skytron Dep. pp. 46-48).

Awarepoint does not dispute the cited testimony or Awarepoint's contractual obligations, but replies that extrinsic evidence may not be used to determine the intention of the parties, vary the terms of the contract, or create ambiguity if a contract is unambiguous. Awarepoint, in effect, argues that because the 2009 Supply Agreement terminated by its express terms on January 1, 2011 for Skytron's failure to meet its sales quota, the extrinsic evidence cited by Skytron is irrelevant. Awarepoint's reply is unavailing and fails to acknowledge or address fundamental contract principles. The evidence presented by Skytron is relevant to the issue whether Awarepoint breached its obligations to Skytron under the Supply Agreements and principles of contract law.

Genuine issues of material fact exist concerning the parties' breach of contract contentions and specifically, the date the 2009 Supply Agreement terminated. Defendant is not entitled to judgment as a matter of law on this issue.

---

[5] Former Awarepoint CEO Jason Howe and former head of sales Kenny Woods.

B.  Limitation of Damages

Awarepoint argues that the Supply Agreements preclude recovery of the damages that Skytron seeks to recover in this action and that Skytron's remedies under the Supply Agreements are limited to repair and replacement of defective products. Awarepoint contends that, first, Skytron has failed to show any link between the alleged breaches and losses suffered by Skytron, i.e, causation; and, second, the Supply Agreements themselves preclude recovery of the damages sought. Alternatively, the Agreements limit damages to $1,000,000. The Court concludes that Awarepoint is not entitled to summary judgment on these issues.

1.  *Causation*

With regard to causation, Awarepoint states that Skytron's Rule 30(b)(6) witness admitted that Skytron cannot point to any specific sale of product that was lost as a result of a breach by Awarepoint, including as examples, Awarepoint's failure to show up for a presentation to Skytron customers, issue joint press releases, give Skytron access to the source code for Awarepoint's software, or provide monthly product updates. Further, Skytron admitted that "[t]here is no guarantee in sales" (Mot. Brf. at p. ID# 714, citing Skytron Dep. at 82). Awarepoint asserts that there could be a number of other possible causes for Skytron's inability to sell its inventory of Awarepoint product (*id.*). Thus, Skytron has failed to show causation, and Awarepoint is entitled to judgment as a matter of law.

Awarepoint's argument fails. As discussed above with regard to termination of the 2009 Agreement, Skytron has presented ample evidence of causation. Additionally, Skytron cites testimony from former Awarepoint CEO Jason Howe in which he acknowledged that the basic principle of the parties' deal "was that as Skytron agreed to purchase a higher level of inventory,

9

Awarepoint agreed to a higher level of involvement and participation in helping Skytron move that inventory," and in fact, "[i]t was even more than that, that we'd kill ourselves trying to help them in any way possible to achieve this number" (Resp. Brf. at p. ID# 973, citing Howe Dep. at 100). Skytron cites in particular to Awarepoint's alleged breach of the Agreement's provision under paragraph 8(c), which earmarks monies Skytron pays to Awarepoint for installation services to be paid to a third-party installer, AIS, which Awarepoint former Chief Operating Officer and interim CEO Brad Weinert confirmed as approximately $3 million in pre-paid installation money that Awarepoint has retained in breach of the Agreement (*id.* at p. ID# 974, citing Weinert Dep. at 89). Given this testimony and the previously cited testimony, Awarepoint is not entitled to summary judgment on its contention that Skytron has failed to show causation.

2. *Contractual Damages Limitations*

Awarepoint argues that the Supply Agreements limit Skytron's damages to direct damages by the express terms, and in any event to $1 million pursuant to ¶ 6(d), which provides:

> **Limitation of Liability**. To the maximum extent permitted under applicable law, except as expressly set forth in the exceptions section below: (I) neither party shall be liable to the other party, or any third party, for any indirect, exemplary, special, consequential or incidental damages of any kind arising in any way out of this agreement or Skytron's distribution of the products, including, without limitation, loss of profits, revenues or data, or costs of replacement goods, even if such party has been advised of the possibility of such damages and not withstanding the failure of any limited remedy of its essential purpose; and (II) in no event will a party's total liability in connection with the sale and distribution of the products or otherwise with respect to this agreement exceed the amount of one million dollars ($1,000,000) under this agreement for the products giving rise to such liability. These limitations apply to all causes of action in the aggregate.

Awarepoint asserts that although Skytron seeks reimbursement for unsold asset tracking equipment, the *only* remedy Skytron has is the return and replacement of defective products; thus, Skytron cannot claim damages based on the purchase price of unsold inventory. Further, any claim

for "lost profits" is precluded under the Agreements because they constitute "consequential damages," which are expressly waived under ¶ 6(d). Therefore, Skytron's damages claims fail as a matter of law. Awarepoint argues that, in any event, even if Skytron is entitled to some form of damages, Awarepoint's liability is limited, under the 2007 agreement, to the cost of the products involved in the breach, and under the 2009 Agreement, to $1 million.

Skytron argues that none of its claimed damages fall into the contractual exclusions. Skytron contends that its alleged damages flow directly from Awarepoint's breaches, such as the $3 million wrongfully retained for pre-paid installation, and massive remaining quantities of useless Awarepoint inventory. Skytron further notes that Awarepoint mischaracterizes the damages as "lost profits," but regardless, Delaware courts do not automatically view lost profits as consequential damages (Resp. Brf. at p. ID# 976 n.2). Additionally, the $1 million limitation is simply inapplicable because that provision of the Agreements was clearly intended to apply to product liability type damages that may arise from the distribution of hardware at issue.[6] Skytron states that Awarepoint's liability arises from the breach of its contractual obligations, not from the failure of the products themselves. And even if the contract limitation were determined to apply beyond damages from the products, the limitation would not apply to damages from intentional wrongdoing or would be void as a matter of public policy, under both Delaware and New York law.

The parties' dispute concerning the recovery of damages and any limitation is not properly resolved on summary judgment. Regardless of the governing legal principles in characterizing

---

[6]Skytron notes that Awarepoint's own briefing shows that it does not view the $1 million limitation as applicable since Awarepoint seeks summary judgment on its counterclaim in the amount of $1,789,422, based on money it claims to be owed for managed services it provided to various hospitals pursuant to the 2009 Agreement.

11

damages, the parties directly dispute the source of the alleged injuries and the resulting nature of the claimed damages. For example, Awarepoint asserts that "Skytron is essentially trying to cancel the orders of Awarepoint Products it made over, at least, a two-year period" (Reply, Dkt 134 at p. ID# 1213), whereas Skytron asserts that "the damages Skytron has sustained as a result of being stuck with millions of dollars in useless Awarepoint inventory are a direct and foreseeable result of Awarepoint's multiple breaches of its obligation to live up to customer commitments and help drive sales of that product to consumers" (Resp. at p. ID# 975-76). In light of the many disputed factual issues surrounding the parties' contractual obligations and their performance over the long course of their business dealings, the source of the injury and the nature of the damages cannot be determined as a matter of law. Awarepoint is not entitled to summary judgment with respect to the alleged damages limitations.

### C. Tortious Interference Claim

To establish a claim for tortious interference with a business relationship or expectancy, a plaintiff must show "(1) the existence of a valid business relationship or expectancy; (2) defendant's knowledge of the relationship; (3) intentional interference by the defendant; and (4) damages resulting from that interference." *Chambers v. City of Detroit*, 786 F. Supp. 2d 1253, 1274 (E.D. Mich. 2011).[7] The defendant's interference "must be 'an act that is per se wrongful' or 'a lawful act with malice and that is unjustified in law.'" *Id.* at 1274-75. "'Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference.'" *Id.* at 1275.

---

[7] The Court previously ruled that this claim is governed by Michigan law (Op., Dkt 126).

Awarepoint argues that the parties were free to compete for customers in the acute care hospital market prior to their limited exclusivity agreement in the October 30, 2008 Notice. And because the limited exclusivity agreement ended with the termination of the 2009 Supply Agreement on January 1, 2011, Skytron cannot maintain any claim for tortious interference before or after that period, i.e., prior to October 30, 2008, and after January 1, 2011. That is, in the absence of any contractual restriction on Awarepoint's ability to compete with Skytron, there is nothing "wrongful" with Awarepoint's actions.

Awarepoint argues moreover, that Skytron cannot maintain any tortious interference claim at all because Skytron cannot show a breach of duty distinct from the alleged breach of contract. "As a general rule, there must be some active negligence or misfeasance to support a tort. There must be some breach of duty distinct from breach of contract" (Mot. Brf. at p. ID# 718, quoting *Rinaldo's Constr. Corp. v. Michigan Bell Tel. Co.*, 559 N.W.2d 647, 656 (Mich. 1997)). Awarepoint states that Skytron bases its claim for tortious interference on an alleged breach of the "limited exclusivity" provisions in the Supply Agreements; thus, Skytron is attempting to assert a tort claim against Awarepoint based on a violation of a purely contractual duty. And Michigan law does not allow a party to "simply re-cast a contract claim as a tort claim where the plaintiff essentially seeks to enforce the contractual arrangement." *See Oak St. Funding, LLC v. Ingram*, 749 F. Supp. 2d 568 (2010) (citing *Rinaldo's*, 559 N.W.2d at 658). There must be a legal duty separate and distinct from the contractual obligation. *Rinaldo's*, 559 N.W.2d at 656 (citing *Hart v. Ludwig*, 79 N.W.2d 895 (Mich. 1956)).

     1. *Claims Prior to October 30, 2008, and after January 1, 2011*

Skytron states that Awarepoint's assertion that the 2009 Agreement terminated January 1,

2011 is wrong. Skytron further argues that its tortious interference claim is a valid alternative claim. *See* FED. R. CIV. P. 8 (providing that "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones," and "[a] party may state as many separate claims or defenses as it has, regardless of consistency"); *see also Ameriwood Indus. Int'l Corp. v. Arthur Andersen & Co.*, 961 F. Supp. 1078, 1082 (W.D. Mich. 1997) (stating that a party "is entitled to plead its claims and defenses in the alternative"). Skytron asserts that in the event that the contract is determined to have terminated on January 1, 2011, Skytron's alternative claim is that Awarepoint tortiously interfered with Skytron's business relationship or expectancies. Skytron asserts that the record facts support a claim that Awarepoint began exploiting Skytron's pre-existing customer relationships in an effort to supplant Skytron and take those accounts over for itself—despite the fact that Skytron had already paid for sales support embedded in the per-unit price of the hardware purchased from Awarepoint.

As an initial matter, having determined above that genuine issues of material fact exist concerning the termination date of the 2009 Supply Agreement, the Court necessarily concludes that Awarepoint's tortious interference argument based strictly on an alleged January 1, 2011 termination fails on summary judgment. This claim cannot be determined as a matter of law. Accordingly, since whether a contract existed during the period at issue is not yet determined, the Court concludes that Skytron's claim is a valid alternative claim. Awarepoint is not entitled to summary judgment on this issue.

2. *Entire Claim*

Skytron does not dispute that under Michigan law, separate duties must apply to maintain a breach of contract and tort action simultaneously. Skytron argues, however, that it has asserted

such a duty in this case. *See Consol. Rail Corp. v. Grand Trunk W. R.R. Co.*, No. 09-10179, 2009 WL 3460334, at *6 (E.D. Mich. Oct. 22, 2009) ("[W]here a contract exists, a tort claim may only be maintained on the basis of a legal duty that is 'separate and distinct from the contractual obligation.'") (quoting *Rinaldo's*, 559 N.W.2d at 657-58).

Awarepoint replies that Skytron has not identified any separate duty distinct from the contractual duties, and moreover, Skytron must show that Awarepoint's conduct was "per se wrongful," i.e., illegal, or "a lawful act with malice that is unjustified in law," *Chambers*, 786 F. Supp. 2d at 1274. Awarepoint asserts that "in attempting to make sales to hospitals with which Skytron had done business in the past (or hoped to in the future), Awarepoint was simply pursuing legitimate sales opportunities" (Reply at p. ID# 1210). Further, Awarepoint's actions are only "wrongful" if they violated the terms of the Supply Agreements, and Skytron's tortious interference claim is simply another way of stating its breach of contract claim.

Again, as an initial matter, given the open question whether a contract existed between the parties after January 1, 2011, the parties' arguments on this issue are speculative. Absent a proper factual premise, e.g., a determination whether Awarepoint's conduct was or was not subject to a contractual "limited exclusivity" provision, and absent a resolution of surrounding material factual and legal disputes, such as the implications of the alleged pre-paid sales support, this issue is not amenable to resolution at this juncture. The Court is not persuaded that Awarepoint is entitled to summary judgment of the tortious interference claim in its entirety.

### D.  Service Fees Owed

Awarepoint asserts that Skytron owes Awarepoint at least $1,789,422.00 under Awarepoint's

counterclaim for payment of "managed service fees"[8] due, which Awarepoint continued to provide (with three exceptions) through November 2012. Awarepoint states that this amount consists of $645,880 due as of September 30, 2011, plus $1,633,560 for the subsequent period through November 2012, minus $490,018[9] in accounts payable owed to Skytron.

Relying on its assertion that Awarepoint committed the first material breach of the parties' contract, and contract law principles, Skytron contends that Awarepoint is barred from recovering the amounts it seeks. Skytron asserts that under both New York and Delaware law, the party that commits the first material breach of an agreement cannot seek to enforce that agreement for its own benefit. *See D.A. Elia Constr. Corp. v. U.S. Fid. & Guar. Co.*, No. 94-CV-0190E(H), 1997 WL 215526, at *5 (W.D.N.Y. Apr. 16, 1997) (citation omitted); *Refinemet Int'l Co. v. Eastbourne N.V.*, 815 F. Supp. 738, 742 (S.D.N.Y. 1993), *aff'd*, 25 F.3d 105 (2d Cir. 1994)); *Frunzi v. Paoli Servs., Inc.*, No. N11A–08–001, 2012 WL 2691164, at *7 (Del. Super. Ct. July 6, 2012) (citing *E. Electric & Heating, Inc. v. Pike Creek Prof'l Ctr.*, 1987 WL 9610 at *4 (Del. Super. Ct. Apr. 7, 1987)). Skytron further asserts that the amount claimed by Awarepoint is more than offset by the damages amount Skytron has demonstrated, including the alleged $3 million in pre-paid installation fees alone. Skytron states that the Court should, in any event, wait until the completion of a trial on the merits to balance the ledger of any respective amounts owed by the parties.

---

[8]These managed services included routine on-site maintenance visits and continuously monitoring the RTLS systems to ensure that the bridges, sensors, and tags were communicating; the resolution of any problems identified; monitoring asset tags and replacing the batteries when needed; and routine software upgrades (Mot. Brf. at p. ID# 719).

[9]Awarepoint's brief states this amount as $490,000; however, according to Awarepoint's calculation of the total, this amount should be $490,018, as stated in the JSMF ¶ 121.

In light of the numerous disputed facts and legal claims, any determination of damages is premature. Accordingly, Awarepoint's request for summary judgment on the amount of damages alleged in its managed services counterclaim is denied.

## IV. Conclusion

The Court concludes that genuine issues of material fact exist concerning the claims and counterclaims. Awarepoint is not entitled to judgment as a matter of law on any of the five matters raised. Awarepoint Corporation's Motion for Partial Summary judgment is therefore denied.

An Order will be entered consistent with this Opinion.


Dated: January 23, 2015                    /s/ Janet T. Neff
                                           JANET T. NEFF
                                           United States District Judge